Phil S. Flemming (#014778)
ROBAINA & KRESIN PLLC
5343 North 16th Street, Suite 200
Phoenix, Arizona 85016
Telephone: (602) 682-6450
Facsimile: (602) 682-6455
psf@robainalaw.com

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| Jennifer Minneci, an individual, | No. |
|---|---|
| Plaintiff | |
| v. | **COMPLAINT** |
| Abbott Laboratories, Inc., a Delaware corporation, | (Sexual Harassment and Discrimination) |
| Defendant. | **Jury Trial Demanded** |

Plaintiff, Jennifer Minneci ("Ms. Minneci"), by undersigned counsel, for her Complaint against Abbott Laboratories, Inc. ("Abbott"), alleges as follows:

**NATURE OF ACTION**

1.      This is an action seeking money damages and equitable relief for violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*., and the Arizona Civil Rights Act, Ariz. Rev. Stat. § 41-1463 related to Ms. Minneci's employment with Abbott.

**PARTIES, JURISDICTION AND VENUE**

2.      Ms. Minneci is a United States citizen residing in Maricopa County, Arizona.

3.      Defendant Abbott is a Delaware corporation doing business in, among other places, Maricopa County, Arizona.  At all relevant times, Defendant caused events to occur in Arizona out of which the claims being asserted herein arose.

4. At all relevant times, Abbott was continuously an employer within the meaning of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*., and Ariz. Rev. Stat. § 1461(6).

5. Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States, specifically Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*.

6. Supplemental jurisdiction over Ms. Minneci's state law claim is proper pursuant to 28 U.S.C. § 1367.

7. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2), because the events giving rise to the claims occurred in this District.

8. Ms. Minneci timely filed with a charge of discrimination against Defendant with the Equal Employment Opportunity Commission ("EEOC") on July 8, 2020.

9. Ms. Minneci received a Notice of Right to Sue from the EEOC on July 16, 2020 and timely commenced this action within ninety-days of its receipt.

10. Ms. Minneci requests a trial by jury in this matter.

**FACTUAL BACKGROUND**

11. Ms. Minneci incorporates all other paragraphs in this Complaint as though fully set forth herein.

12. Abbott is a health care company that manufactures and sells medical devices, instruments, medications, and other health care products.

13. Abbott is headquartered in Illinois and does business throughout the United States including in Arizona and Internationally.

14. Ms. Minneci has a Bachelor of Science in biology and a Master of Science in evolutionary biology.

15. Ms. Minneci has an ASCP certification as a laboratory technician.

16. Before working for Abbott, Ms. Minneci worked as a histotechnologist and then a lab manager for Sonora Quest Laboratories from 2008 – 2014.

///

17. From 2015 – July 2018, Ms. Minneci worked as an application specialist and molecular sales specialist for Agilent Technologies.

18. From July 2018 – February 2019, Ms. Minneci worked as a reagent sales specialist, selling antibodies for pathology diagnostics for Biosystems. That position was eliminated in a corporate restructure.

19. Ms. Minneci commenced employment with Abbott on March 4, 2019 as an Account Executive in its Rapid Diagnostics Division selling infectious disease testing to hospital accounts.

20. Ms. Minneci's direct supervisor is Regional Director, George Grkovic.

21. Mr. Grkovic became Ms. Minneci's direct supervisor in June 2019.

22. Since taking over the region, Mr. Grkovic has stated on more than one occasion that he wants to hire his "own team."

23. Ms. Minneci has observed that Mr. Grkovic treats Ms. Minneci has observed that Mr. Grkovic treats female employees less favorably than male employees.

24. Two women on Mr. Grkovic's team quit shortly after he started: Patty Yudin and Jodi Nishida.

25. Ms. Yudin and Ms. Nishita told Ms. Minneci that they felt they were pushed out by Mr. Grkovic.

26. Ms. Yudin and Ms. Nishita shared stories of unfavorable treatment by Mr. Grkovic impacting their employment opportunities.

27. In June 2019, Ms. Minneci attended a sales training in Chicago, Illinois.

28. At the time, Ms. Minneci was dealing with her father's serious cancer diagnosis and hospitalization and asked if she could miss a dinner that was scheduled after the training meeting.

29. Ms. Minneci was told the meeting was mandatory.

30. Ms. Minneci attended as directed but took some telephone calls concerning her father being admitted to the ICU.

31. When people at the dinner began leaving, Ms. Minneci left.

3

32. Mr. Grkovic later asked Ms. Minneci why she left the dinner early.

33. When Ms. Minneci explained that her father was being admitted to ICU and that she was talking to her mother on the phone.

34. Mr. Grkovic responded that he did not want to know about her personal life and that there is no free time in trainings.

35. In August 2019 after a sales meeting in San Diego the team met for dinner and then walked back to the hotel as a group.

36. As the group was walking, two male account representatives said they were going to go to a bar and departed from the group.

37. Members of the group noticed later that Mr. Grkovic had also left without saying anything.

38. The rest of the team returned to the hospitality suite.

39. Later in the evening Mr. Grkovic and the other two male employees joined the hospitality suite, obviously having been drinking.

40. At a September 2019 conference in Scottsdale, Arizona, Account Executive Tiffany Netters received a call from a customer about a deal she had been working on.

41. During the call, the customer significantly reduced its purchasing commitment.

42. After the call, Mr. Grkovic led Ms. Netters out a set of glass doors leading to an exterior patio where he proceeded to publicly and loudly berate her for wasting everyone's time on this deal.

43. In October 2019, Ms. Minneci telephoned Mr. Grkovic requesting assistance on a challenging large sales opportunity (approximately $350,000).

44. Mr. Minneci declined to help and told her to call Tiffany West, in another region, for assistance.

45. Ms. Minneci explained why Ms. West would be of limited assistance.

46. Mr. Grkovic raised his voice and abruptly hung up.

47. The next Monday, October 28, 2019, Mr. Grkovic scheduled an in-person

1   meeting with Minneci for 2:30 p.m.

2       48.    When asked the purpose of the meeting, Mr. Grkovic refused to disclose.

3       49.    On the day of the meeting, Mr. Grkovic changed the time of the meeting to

4   3:30 p.m.

5       50.    While Ms. Minneci was driving to the meeting, Mr. Grkovic sent a text

6   message wanting to reschedule for later in the week.

7       51.    Ms. Minneci responded that she would be traveling for work the remainder

8   of the week.

9       52.    Mr. Grkovic then changed the meeting to 4:30 p.m., but ultimately did not

10  arrive until 4:44 p.m. and was on the phone until 4:55 p.m.

11      53.    When he finally joined Ms. Minneci for the meeting, Mr. Grkovic hastily

12  told Ms. Minneci that her territory would change effective January 1, 2020 and talked

13  about being a team player.

14      54.    Ms. Minneci did not understand the purpose of the meeting or why he

15  discussed being a "team player."

16      55.    October 30, 2019, Mr. Grkovic sent Ms. Minneci a text message late in the

17  evening to say that he would not be attending a customer meeting with her the following

18  morning.

19      56.    Mr. Grkovic previously requested Ms. Minneci set up the meeting which

20  was a three-hour drive from Phoenix.

21      57.    Mr. Grkovic e-mailed Ms. Minneci the following morning, before the

22  meeting time, to ask for an update on how the meeting went.

23      58.    On the drive home, Mr. Grkovic called Ms. Minneci several times to discuss

24  the meeting but the calls were dropped due to spotty service in the remote areas through

25  which she travelled.

26      59.    Mr. Grkovic snapped at Ms. Minneci for the dropped calls and ordered her

27  to call him when she returned to Phoenix.

28      60.    Mr. Grkovic also demanded Ms. Minneci to follow up with customers over

the phone, so she could provide updates when she called him later that day.

61. Ms. Minneci asked how she could contact customers with the sketchy cell phone coverage and Mr. Grkovic told her to "figure it out."

62. This, despite Abbott's policy prohibiting use of electronics, including hands-free usage while operating a vehicle.

63. On Monday, November 4, 2019, Ms. Minneci sent Mr. Grkovic an email asking to continue their conversation from the previous Monday (October 28) during her scheduled telephonic one-on-one later that same day.

64. Because she had not known the purpose of their previous meeting in advance and had felt unprepared and wanted to address follow-up questions.

65. During their conversation, Mr. Grkovic replied in an intimidating manner, as to what did she think was the purpose?

66. Mr. Grkovic criticized that he had to interact with two versions of her, one that he described as easy-going and the other as petty and hostile.

67. Ms. Minneci was taken aback by his animosity and asked for examples to learn from his criticism.

68. Mr. Grkovic brought up Ms. Minneci's request to skip the June 2019 training dinner.

69. When Ms. Minneci reminded Mr. Grkovic that the reason she did not want to attend the dinner was because her father was being admitted to ICU, he responded in a hostile and dismissive manner that he did not need to hear about her personal life.

70. His response was in sharp contrast to the camaraderie he exudes with the male employees under his supervision.

71. During this same November 4 conversation Mr. Grkovic brought up the October 2019 phone call with Ms. Minneci where he had hung up on her, rudely telling her she had talked too much and that he had had other things to do that resulted in him hanging up the telephone abruptly.

72. On November 11, 2019, Mr. Grkovic attended a customer sales meeting

with Minneci.

73. Before the meeting, Mr. Grkovic and Matthew House, Non-Seasonal Strategic Business Executive, instructed Ms. Minneci to add a product on the contract that this customer did not currently utilize, which would reduce the pricing on the products the customer already purchased.

74. Ms. Minneci told Mr. Grkovic that there was a prior email from the customer that specifically said it was not interested in this added product and did not want it included in the contract.

75. Mr. Grkovic replied that he was certain the customer would agree to the added product when the reduced pricing for other products was realized.

76. Ms. Minneci said this would not be well-received by this customer and, therefore, insisted that Mr. Grkovic attend the meeting where the contract proposal was to be presented.

77. At the customer's site for the November 11, 2019 meeting, Ms. Minneci waited and searched for Mr. Grkovic prior to the starting time, to connect and prepare, but he was nowhere to be found.

78. Precisely one minute before the start time, Mr. Grkovic walked into the office dressed only in denim jeans and with his shirt sleeves rolled up casually.

79. The customer and Ms. Minneci took notice of Mr. Grkovic's unprofessional attire.

80. The customer initially reviewed the proposed product list and pricing and jabbed her finger at the added product that Mr. Grkovic had demanded be added to the list.

81. The customer was not pleased and announced that product was not to be on the contract, producing a printed copy of the email she had sent with that direction.

82. Mr. Grkovic turned to Ms. Minneci and menacingly said in front of the customer, "Did you know about this?"

83. Ms. Minneci remained professional in front of the customer and shifted the conversation to other products.

84. When she and Mr. Grkovic left the meeting, he again attacked her for making the customer unhappy and she reminded him that she had told him multiple times in the telephone calls with Mr. House that this customer had specifically rejected the product but they ordered her to add it anyway due to the pricing.

85. Ms. Minneci felt that Mr. Grkovic was trying to force her out of Abbott.

86. On January 1, 2020, Mr. Grkovic changed Ms. Minneci's sales territory.

87. Before the territory change, Ms. Minneci covered hospital accounts and a coworker, Tiffany Netters covered the medical office accounts in their shared region.

88. The pair shared sales quotas for the territory.

89. As part of the territory change, Ms. Netters was moved to a different territory leaving Ms. Minneci without a partner.

90. During this time Mr. Grkovic advised Ms. Minneci that she has a quota to sell or place 100 instruments in 2020.

91. Later in January 2020, Ms. Minneci attended a national meeting during which she was notified that each territory (not Account Executive) had a quota of 200 instrument sales or placements in 2020.

92. On January 23, 2020, during a call with Mr. Grkovic and two other male Account Executives, Ms. Minneci asked Mr. Grkovic for clarification on the quota and whether there would be any adjustment for her since she no longer had a partner in her territory.

93. Mr. Grkovic raised his voice and accused Ms. Minneci of challenging him and calling him a liar.

94. Mr. Grkovic later told Ms. Minneci that the 200 quota was correct, not 100 and that the quota remained 200 despite not having a partner in the territory.

95. Ms. Minneci believed Mr. Grkovic set an unrealistic goal for her in his effort to push her out.

96. During a national sales Meeting in Dallas, February 2020, a male team member, Gene gave an incomplete business review.

97. Mr. Grkovic did not criticize him in front of the rest of the team, as he commonly does when a female employee makes a mistake.

98. At the Dallas meeting, Mr. Grkovic verbally attacked a female teammate, Casey Dutcher, in during a business review, about calling on the right type of account.

99. A few weeks later, Mr. Grkovic sent Ms. Dutcher an intimidating email demanding she improve her performance within the next 30 days.

100. At the same national sales meeting, a "mandatory" dinner was held.

101. Gene, the male colleague who gave the incomplete business review left the "mandatory" dinner to take out a woman he matched on the Tinder dating application.

102. Mr. Grkovic permitted this male coworker flexible attendance to go on a date but had told Ms. Minneci that the dinner was mandatory.

103. After the mandatory dinner, the team members headed to the elevator to socialize in the hospitality suite.

104. Ms. Minneci asked Mr. Grkovic on which floor the hospitality suite was located and he did not answer.

105. He replied that he was going to his room on the 20th floor.

106. Taking his cue, none of the other team members told her where the suite was located.

107. The next morning, Ms. Minneci heard the team members sharing stories about the fun they had at the hospitality suite.

108. Mr. Grkovic deliberately excluded Ms. Minneci.

109. Also while at the Dallas meeting, Mr. Grkovic and Strategic Business Executive, Brian Manning made plans to travel to another Account Executive's territory to help close a deal.

110. When Ms. Minneci asked what it would take to get one of them to accompany her to customer meetings, Mr. Manning responded, "find bigger deals" and he and Mr. Grkovic laughed and turned their backs.

111. A few weeks after the Dallas meeting, Gene could not be found on a Friday

workday.

112. Brian Manning, Strategic Business Executive, worked to resolve an issue with one of Gene's customers.

113. The following week, Gene again could not be found during a workday.

114. Mr. Grkovic asked another employee, Ms. Netters, to help him resolve a problem in Gene's absence, because the customer threatened to take its business elsewhere.

115. Mr. Grkovic did not publicly criticize or humiliate Gene, as he regularly does toward female employees.

116. In February 2020, a Strategic Business Executive from New Mexico travelled with Ms. Minneci for support and asked about Strategic Business Executive, Brian Manning.

117. Ms. Minneci responded that she really did not know much about Mr. Manning, as he never travelled with her.

118. Ms. Minneci explained that she tried to get Mr. Manning to travel to customer accounts with her but that he always cancelled.

119. Later in February, Ms. Minneci represented Abbott at a Phoenix product meeting.

120. Mr. Grkovic attended for a short time but worked in the lobby rather than work with Ms. Minneci.

121. Before leaving, Mr. Grkovic pulled Ms. Minneci aside and told her that he heard she was complaining that no one travelled with her.

122. He demanded Ms. Minneci come to him with concerns, not someone outside the region.

123. Ms. Minneci responded that she had been trying to get him to travel with her since November to no avail.

124. On February 12, Ms. Minneci contacted the Abbott Human Relations Office to seek guidance about the harassment from Mr. Grkovic, consistent with the Abbott Code

of Conduct, "Decision making AID" and "Speak Up" guidance.

125. Ms. Minneci was advised that a facilitated discussion with Mr. Grkovic and a representative from the Abbott Human Resource department would be scheduled. It was not.

126. On Friday, March 6 at 1:54 p.m., after Ms. Minneci updated Mr. Grkovic on her accounts, he emailed her, told her it was great to hear about the meetings and asked for a detailed summary.

127. Ms. Minneci was working in the field until 5:00 p.m., so could not work on the summary right away.

128. The next workday, Monday, March 9, Mr. Grkovic sent Ms. Minneci an email at 7:57 a.m. asking for the detailed summary.

129. Three minutes later during an 8:00 a.m. teleconference with Mr. Manning, Mr. Grkovic disapprovingly reported to the supervisor that he had asked Ms. Minneci for the summary "twice," falsely implying she had not performed as requested.

130. His critical comments created an unjustified negative impression of Ms. Minneci and was embarrassing.

131. Again in March, Ms. Minneci contacted the Abbott Human Resource department about the harassment and discrimination she was enduring from Mr. Grkovic.

132. On March 16, 2020, Mr. Grkovic was conducting a team conference call where the audio was not working.

133. As the team members waited, Ms. Minneci sent a comical meme to participants of the conference call to lighten the mood.

134. The meme was an image of a mime to make light of the lack of audio on the call.

135. Later in the day, Mr. Grkovic criticized her about the meme and claimed it was unprofessional, beneath Abbott's standards.

136. Mr. Grkovic also stated that he knew she had contacted the Abbott Human Resource department about him.

137. Mr. Grkovic stated he would assess what action to take and contact her the next day.

138. Ms. Minneci replied that she would wait for his call, but she was confused because her message was similar to meme images distributed by other team members.

139. Ms. Minneci did not know why Mr. Grkovic found it offensive.

140. Ms. Minneci learned that Mr. Grkovic took the meme issue to the Human Resource Department and made a complaint.

141. Ms. Minneci asked two co-workers if they found the meme offensive or crossed the line and both said no.

142. Other male employees have sent memes and used offensive terms in text exchanges during meetings.

143. In a meeting before the March 16 meeting during which Ms. Minneci sent the mime meme, a male colleague texted the word "dammit" to the group with no repercussions.

144. After Ms. Minneci's contacts with Abbott's Human Resource department, Mr. Grkovic continued to materially impact Ms. Minneci's workplace and job performance, setting obstacles, criticizing and harassing her.

145. Mr. Grkovic continued in his refusal to attend customer meetings with Ms. Minneci.

146. Ms. Minneci's male counterparts were treated significantly more favorably than Ms. Minneci, including Gene, who had significant assistance from Mr. Grkovic and Mr. Manning.

147. Upon information and belief, the Abbott Human Resource department did not investigate Ms. Minneci's harassment and discrimination claims against Mr. Grkovic.

148. Because of Abbott's inaction, Ms. Minneci was forced to continue work with her harasser who was also her direct supervisor.

149. Eventually, Ms. Minneci realized that Abbott was not going to help her and that Mr. Grkovic was not going to stop harassing and discriminating against her.

150. On June 5, 2020, Ms. Minneci constructively resigned from her position.

## LEGAL ANALYSIS

### Claim One

**(Disparate Treatment Discrimination and Harassment in Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*.)**

151. Ms. Minneci incorporates all other paragraphs in this Complaint as though fully set forth herein.

152. Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-(2)(a) makes it unlawful for an employer (1) . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's … sex …

153. Disparate treatment discrimination can be established with direct or circumstantial evidence showing the employer intentionally "treats some people less favorably than others because of their …sex." *Int'l Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335 n. 15 (1977).

154. Ms. Minneci and other female employees were treated less favorably by Mr. Grkovic than their male counterparts.

155. Ms. Minneci was continuously berated, unfairly criticized, and embarrassed by Mr. Grkovic in front of other employees, in contrast to her male counterparts.

156. Ms. Minneci was not provided with the help other male account executives received.

157. Many female employees, including Ms. Minneci have left Abbott because of the disparate treatment of female employees by Mr. Grkovic.

158. Abbott did not resolve the discrimination against Ms. Minneci despite her complaints to Abbott's Human Resource department.

159. As a result of the continued disparate treatment sexual harassment, Ms. Minneci suffered damages in amount to be proven at trial.

///

## Claim Two

## Violation of the Arizona Civil Rights Act, A.R.S. § 41-463

## Discrimination and Harassment based on sex

160. Ms. Minneci incorporates all other paragraphs of this Complaint as though fully set forth herein.

161. The Arizona Civil Rights Act ("ACRA"), A.R.S. § 41-1463(B)(1) makes it unlawful for an employer:

> "[t]o fail or refuse to hire or to discharge any individual or otherwise to discriminate against any individual with respect to the individual's compensation, terms, conditions or privileges of employment because of the individual's … sex."

162. Ms. Minneci was harassed and discriminated against based on sex.

163. Ms. Minneci and other female employees were treated less favorably than her male counterparts.

164. Ms. Minneci was continuously berated, unfairly criticized, and embarrassed by Mr. Grkovic in front of other employees, in contrast to her male counterparts.

165. Ms. Minneci was not provided with the help other male account executives received.

166. Many female employees, including Ms. Minneci have left Abbott because of the disparate treatment of female employees by Mr. Grkovic.

167. Abbott did not resolve the discrimination against Ms. Minneci despite her complaints to Abbott's Human Resource department.

168. As a result of the continued discrimination and harassment based on sex, Ms. Minneci suffered damages in amount to be proven at trial.

## Claim Three

## Constructive Discharge in Violation of the Arizona Employment Protection Act

169. Ms. Minneci incorporates all other paragraphs of this Complaint as though fully set forth herein.

170. The Arizona Employment Protection Act (AEPA), A.R.S. § 23-1501, *et*

*seq.*, affords an employee a claim against her employer where the employee is [constructively] terminated in retaliation for:

> (c)(2) The disclosure by the employee in a reasonable manner that the employee has information or a reasonable belief that the employer, or an employee of the employer has violated, is violating or will violate the Constitution of Arizona or the statutes of this state to either the employer or a representative of the employer who the employee reasonably believes is a managerial or supervisory position and has the authority to investigate the information provided by the employee and to take action to prevent further violations …

171. Ms. Minneci disclosed to the Abbott Human Resource department that Mr. Grkovic harassed and discriminated against herself and treated female employees less favorably than male employees.

172. Abbott did not investigate the claims and did not take her claims seriously.

173. Mr. Grkovic made it known to Ms. Minneci that he was aware of her complaints and retaliated against her by continuing the harassment and discrimination against her.

174. With no end in sight and believing that Mr. Grkovic was trying to force her out as he did with other female employees, Ms. Minneci reasonably resigned her position on June 5, 2020.

**WHEREFORE,** Ms. Minneci requests Judgment against Defendant as follows;

A. for back pay;
B. for compensatory damages;
C. for punitive damages;
D. for front pay;
E. for attorneys' fees and costs;
F. for interest on any judgment from the date of entry of judgment until paid in full; and

      G.    for any other damages or remedies the Court deems just and reasonable.

DATED this 11th day of August 2020.

                              ROBAINA & KRESIN PLLC


                          By   /s/ Phil S. Flemming
                               Phil S. Flemming
                               Attorneys for Plaintiff